UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THERON CHARLES                                    CIVIL ACTION

VERSUS                                            NO. 13-2517

CAROLYN W. COLVIN, COMMISSIONER                   SECTION "R" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Theron Charles, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1381a. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.   PROCEDURAL HISTORY

Charles filed his application for SSI on January 20, 2011, alleging disability since January 12, 2010, due to diabetes, high blood pressure and a left foot bone infection. (Tr. 86, 136-40). After his application was denied at the agency level, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 14, 2011. Plaintiff waived his right to be represented by an attorney at the hearing. (Tr. 39-40,

135).  On February 17, 2012, the ALJ issued a decision denying the application for benefits.  (Tr. 8-20).

Plaintiff retained an attorney, who submitted additional medical records and an appeal brief in which Charles amended his alleged onset date to June 1, 2011.  (Tr. 5, 203-04).  The Appeals Council considered the new evidence from December 2011, but found that it provided no basis to change the ALJ's decision.  After the Appeals Council denied review on March 1, 2013, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-4).

Plaintiff filed a timely memorandum of facts and law.  Record Doc. No. 21. Defendant filed a timely reply memorandum.  Record Doc. No. 24.

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ failed to consider all relevant medical evidence when assessing plaintiff's credibility and residual functional capacity.

B.   The ALJ neglected to consider whether plaintiff's impairments met or equaled Listings 1.02(A), 8.04 and/or 11.14.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   Plaintiff has not engaged in substantial gainful activity since January 20, 2011, the application date.

2

2.      He has the following severe impairments: diabetes mellitus, osteomyelitis[1] and recurrent ulcerations on his left foot, hypertension and decreased vision.

3.      He does not have a medically determinable impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically including sections 1.00, 2.00 and 4.00.

4.      Charles has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except that he may never climb ladders, ropes and scaffolds; is limited to occasional climbing of ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; cannot see at a distance; and must avoid concentrated exposure to temperature extremes and workplace hazards.

5.      His statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

6.      Plaintiff is not capable of performing any of his past relevant work, which were at the light, medium and heavy exertional levels.

7.      Considering his age as a younger individual, his limited education, his work experience and his residual functional capacity, jobs exist in significant numbers in the national economy that he can perform.

8.      Charles has not been under a disability since the application date of January 20, 2011.

(Tr. 13-14, 16-17).

---

[1]Osteomyelitis is inflammation of the bone marrow and adjacent bone. Stedman's Medical Dictionary (27th ed. 2000), at STEDMANS 289060 (on Westlaw).

IV.   <u>ANALYSIS</u>

A.   <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  <u>Richard ex rel. Z.N.F. v. Astrue</u>, 480 F. App'x 773, 776 (5th Cir. 2012) (citing <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005)); <u>Stringer v. Astrue</u>, 465 F. App'x 361, 363 (5th Cir. 2012) (citing <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Richard ex rel. Z.N.F.</u>, 480 F. App'x at 776; <u>Stringer</u>, 465 F. App'x at 363-64; <u>Perez</u>, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  <u>Halterman ex rel. Halterman v. Colvin</u>, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000)); <u>Stringer</u>, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Luckey v.</u>

Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614,

617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence,

regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma,

503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record

in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir.

2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are

supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308,

311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI, plaintiff must show that he is

unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2011).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.[2]  Id. §§ 404.1520, 416.920;

Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501

F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461.  The five-step inquiry terminates

if the Commissioner finds at any step that the claimant is or is not disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If

he successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing.  When the Commissioner shows that the claimant is

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability:  "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'"  Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Charles testified that he finished high school.  (Tr. 77).  He stated that he injured his hands at the beginning of November 2011, and was seen in the emergency room at Lallie Kemp Regional Medical Center in Independence, Louisiana.  He said he was then hospitalized at LSU Public Hospital in New Orleans, where he had surgery on both hands.  (Tr. 46-48).  He stated that he continues to receive outpatient care, such as removal of stitches and physical therapy, for his hands at LSU.  (Tr. 48-49).

Plaintiff stated that he had tried to stop a knife fight.  He said he was cut across two fingers of his right hand and two fingers and the thumb of his left hand when he grabbed the knife to prevent the fighter from injuring someone else.  (Tr. 49-50).  He testified that he had surgery to reattach the tendons in both hands.  (Tr. 50-51).  The ALJ

7

explained to Charles that his hand problems are not included in his current disability application because they have not lasted or cannot be expected to last for more than 12 months.  (Tr. 51-52).

Charles testified that infection problems with his feet started about two years earlier when he was in California, beginning with his left pinky toe.  He said he was treated at Highland Hospital in California, where the area was cleaned up and a pad put on it so he did not walk on it.  He stated that it never cleared up, but became a hard-skinned area on the bottom of his left foot.  He said he also had blood clots under the toe. He testified that he was hospitalized in California, where the doctors almost had to amputate the toe, but they were able to save it.  (Tr. 53-54).

Plaintiff stated that he went to Lallie Kemp Medical Center for treatment in Louisiana after moving back from California in July 2010.  (Tr. 54-55).  He testified that the infection was really bad in January 2011, he was hospitalized for nine or ten days, and the doctors again thought they might have to amputate.  He said he received a lot of intravenous antibiotics both in the hospital and after he came home.  (Tr. 56-57).  He testified that the problem was in the same place on his left foot, which kept coming back and not really ever healing.  He stated that it still is not healed completely, and he must go to the hospital once a month to have skin shaved off.  (Tr. 57).

8

Charles said he no longer takes antibiotics for the foot problem, although he is currently taking antibiotics because of his hands, and that he goes for foot care because he is diabetic. He testified that he has a pad glued to the bottom of his foot and he wears special shoes that have pads in them, with spaces cut out for the problem area on his left foot. (Tr. 58-59).

Plaintiff said he understands from his doctors that he is supposed to stay off his foot and cannot lift any weight because it hurts his foot. He stated that he cannot walk or cut the grass because those activities hurt his foot. (Tr. 60-61). He testified that he can drive, but tries to limit his driving. He said he lives with his mother.

Charles stated that he takes insulin injections once a day. He said he was taken off Metformin pills when he was put on insulin some time before November 2011. (Tr. 61-62). Plaintiff's mother, Delores Charles ("Delores"), testified that he was switched from Metformin to insulin after he was tested and diagnosed with gastroparesis in August 2011. (Tr. 63). Plaintiff said he checks his blood sugar twice a day and that it runs between 90 and 120. He testified that it was higher when he was on Metformin, which is why his doctors switched him to insulin injections.

Charles stated that Metformin caused him to have bad diarrhea and that he still has diarrhea. He said he did not sleep the night before the hearing because he went to the bathroom all night. (Tr. 64). He said he did not know why he still has diarrhea if the

9

Metformin was causing it.  He testified that he has another appointment with Dr. Hussein, a stomach doctor in Bogalusa, because the medicine he was given for his stomach is not working.

Plaintiff said he has suffered with chronic, liquid diarrhea at night for three years and that he went to the bathroom more than 12 times the previous night. (Tr. 64-65).  He testified that the diarrhea is dehydrating his kidneys.  He stated that Dr. Hussein prescribed iron because of that.  He said he understood that one of the reasons he was switched from Metformin to insulin was because Metformin was causing diarrhea.  He testified that he has lost more than 20 pounds in the last two years and that he cannot keep any weight on "because everything is coming out of me."  (Tr. 66-67).  He said he lost 11 pounds while he was in the hospital in January 2011.

Charles testified that he has "a wobble" when he stands and he cannot stand up straight because of his diabetic foot problems.  He said he also has dizzy spells because of his foot causing him to be "off."  (Tr. 67-68).  He stated that he tried to work for a temporary service in October 2011, but had to quit after two days.  He stated that someone at that job asked him if he had been drinking.  Charles testified that he does not drink and that his bad feet cause him to wobble.  He stated that the job was to put up and take down guardrails on the interstate.  He said he threw up while he was working.  He

thought he threw up because his blood pressure was high.  (Tr. 68-69).  He testified that he had not tried any other work since he applied for benefits in January 2010.

Plaintiff stated that he gets lightheaded and weak and that his appetite is nonexistent.  He said he tries to nap during the day, but cannot sleep.  He reiterated that he did not sleep at all the previous night and said he had not slept since he got up the previous morning.  (Tr. 70).  He said he has to run to the bathroom every 10 to 15 minutes, which means he never can fall asleep before his "stomach get [sic] to bubbling" and he has to get up again.  Charles explained that he has cramps and can feel a lot of gas or "air pockets" in his stomach.  He stated that Dr. Hussein treats him for his stomach problems with iron and other medications, including Reglan.[3]  He testified that he does not know whether these problems are related to his diabetes and does not know whether Reglan is for nausea, but he just takes what he is supposed to take.  (Tr. 71-72).  He said his biggest problems are his feet because he is losing feeling in both of them, and that the loss is progressing up his legs.  (Tr. 72-73).

Plaintiff's mother, Delores, testified that Charles is unable to do anything because he had been in the hospital three times in the past year because of his diabetes.  She said

---

[3]Reglan (metoclopramide) is "indicated for the relief of symptoms associated with acute and recurrent diabetic gastric stasis.  The usual manifestations of delayed gastric emptying (e.g., nausea, vomiting, heartburn, persistent fullness after meals, and anorexia) appear to respond to [Reglan] . . . within different time intervals."  RxList, http://www.rxlist.com/reglan-drug/indications-dosage.htm (last reviewed on RxList 12/17/2010) (visited Feb. 28, 2014).

the major problems are his feet and the infections, and that he lies down a lot because his feet hurt when he tries to walk.  She said he used to work before he got sick, but now he just stays home.  (Tr. 73-74).

Delores stated that Charles worked as a cook for a couple of weeks, but she had to bring him home because he started throwing up.  She said he has been unable to do everything that he has tried lately.  (Tr. 81).  She testified that she has only a part-time job and she cannot leave her son alone for any length of time, such as to go on vacation, because when she does, she has to come back early because he gets sick again.  (Tr. 83).

C.      Vocational Expert Testimony

A vocational expert, Patricia A. Knight, testified at the hearing that plaintiff's past relevant work is classified as follows:  a warehouse laborer is at the medium exertional level and unskilled; a valet car attendant is light and unskilled; an installer and assembler of office cubicles and furniture is heavy and semi-skilled; a box packer for a moving company is medium and unskilled; a worker at a chicken processing plant is light and unskilled; an automobile detailer is medium and unskilled; and various construction jobs that Charles performed are heavy and semi-skilled.  (Tr. 76).

The ALJ posed a hypothetical of an individual with plaintiff's age, education and past relevant work experience who can perform sedentary work, meaning that he can occasionally lift and carry ten pounds, can frequently lift and carry less than ten pounds,

can stand and/or walk for a total of two hours and can sit for a total of six hours in an eight-hour workday.  The person can never climb ladders, ropes and scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; cannot see at a distance; and must avoid concentrated exposure to temperature extremes and workplace hazards.  Knight testified that such a person could not perform any of plaintiff's past relevant work, but could perform other jobs available in Louisiana and the United States, such as hand packager; inspector, tester or sorter; interviewer; order clerk; and reception and information clerk.  (Tr. 78-79).

The ALJ posed a second hypothetical in which the person, in addition to the restrictions above, could not sustain a consistent 40-hour work week schedule and/or would miss more than three days of work per month because of his illnesses.  Knight testified that such an individual would not be able to perform any work.

The ALJ posed a third hypothetical with the same parameters as the first one, but with the additional limitation that the individual has less than an occasional ability to use both hands for gross and fine manipulation.  Knight's response to this hypothetical was inaudible.  (Tr. 79).

13

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 14-16).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ considered all relevant medical evidence when assessing plaintiff's credibility and residual functional capacity.

Plaintiff bears the burden of proving that he suffers from a disability under the first four parts of the sequential inquiry.  Perez, 415 F.3d at 461.  The ALJ found at the fourth step that Charles has the residual functional capacity to perform sedentary work, except that he may never climb ladders, ropes and scaffolds; is limited to occasional climbing of ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; cannot see at a distance; and must avoid concentrated exposure to temperature extremes and workplace hazards. Determining the credibility of plaintiff's subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence.  Luckey, 458 F. App'x at 326 (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462.

Charles argues that the ALJ failed to consider all of the relevant medical evidence when she found him not credible and therefore failed in her duty to develop the record fully and fairly, when he was unrepresented at the hearing. Plaintiff contends that the ALJ failed to incorporate additional limitations that he claims are supported by the medical evidence and his credible testimony at the administrative hearing. He complains that the ALJ's discussion of the medical evidence was "scant and rather cursory," and that the ALJ's references to his noncompliance with his diet and medication regimen are unsupported by specific citations to the evidence. He states that, when he appealed the ALJ's decision, he amended his alleged onset date to June 1, 2011, to resolve the noncompliance issue and that, because the medical records contain no references to any noncompliance after May 2011, the ALJ's credibility evaluation is unsupported. Record Doc. No. 21 at p. 7.

When a claimant "was not represented by counsel at the hearing, the ALJ was under a heightened duty to scrupulously and conscientiously explore all relevant facts." Castillo v. Barnhart, 325 F.3d 550, 552-53 (5th Cir. 2003) (citing Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996)). As in Castillo, the transcript in the instant case shows that the ALJ questioned Charles and his mother regarding his age, education, past relevant work, multiple impairments and medical testing and treatment, "and gave both [Charles and his mother] opportunities to add anything else to the record. We conclude

that the ALJ's questions and the [plaintiff's and his mother's] opportunities to add additional information into the record satisfied the ALJ's heightened duty to develop the record."  Id. at 553 (citing James v. Bowen, 793 F.2d 702, 704-05 (5th Cir. 1986)).

The ALJ did not make a mere conclusory statement regarding plaintiff's credibility.  She explained specifically why she found that his subjective symptoms and alleged limitations were not credible and were inconsistent with the evidence as a whole. The medical records are extensive and plaintiff's severe impairments, which the ALJ recognized, are supported by objective testing and treatment notes.  However, the ALJ accurately noted that the medical evidence indicates that Charles had many instances of noncompliance with his treatment regimen and that his conditions improved when he received treatment.  (Tr. 15-16).

The ALJ is not required to discuss every piece of evidence, particularly "when dealing with such an extensive and multi-faceted record."  Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011) (citing Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989); Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)).  "The ALJ is not required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility."  Clary v. Barnhart, 214 F. App'x 479, 482 (5th Cir. 2007) (citing Falco, 27 F.3d at 163). The ALJ is required only to review the entire record, resolve conflicts in the evidence and state specific reasons for her credibility findings,

16

supported by the evidence.  Luckey, 458 F. App'x at 324; Giles, 433 F. App'x at 249
(citing  SSR  96-7p);  Newton,  209  F.3d  at  452.    The  ALJ  complied  with  these
requirements in the instant case.

A claimant's lack of need for medication or failure to seek treatment are relevant
factors to consider in determining the severity of an alleged impairment and may be used
in conjunction with the medical reports to discount plaintiff's complaints of disabling
pain or other limitations. Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan
v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20
C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991));
Austin v. Apfel,  205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing Griego
v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991)).

In addition, a medical condition that can reasonably be remedied by surgery,
treatment or medication is not disabling. Muckelroy v. Astrue, 277 F. App'x 510, 511-12
(5th Cir. 2008) (citing Burnside ex rel. Burnside v. Bowen, 845 F.2d 587, 592 (5th Cir.
1988), abrogated on other grounds by Sullivan v. Zebley, 493 U.S. 521, 527 (1990));
Hebert v. Barnhart, 197 F. App'x 320, 323 (5th Cir. 2006) (citing Johnson v. Bowen, 864
F.2d 340, 348 (5th Cir. 1988)); Leblanc v. Chater, 83 F.3d 419, 1996 WL 197501, at *3
(5th Cir. 1996); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); Acosta v. Astrue,
865 F. Supp. 2d 767, 790 (W.D. Tex. 2012); Quintanilla v. Astrue, 619 F. Supp. 2d 306,

321 (S.D. Tex. June 27, 2008); see also Thibodeaux v. Astrue, 324 F. App'x 440, 443-44 (5th Cir. 2009); Bolton v. Apfel, 237 F.3d 632, 2000 WL 1701816, at *1 (5th Cir. Nov. 3, 2000).

The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007). The ALJ's explanation of her reasons for finding plaintiff not entirely credible is all that is required. James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999).

The diagnosis of an impairment, even if it is a severe impairment under Social Security regulations, does not establish a claimant's disability. Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431(5th Cir. 2006); Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Sec'y

18

of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Martin v. Chater, No. 95

C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan,

925 F.2d 220, 222 (7th Cir. 1991)).  Charles "'must show that [he] was so functionally

impaired by [his diagnosed impairments] that [he] was precluded from engaging in any

substantial gainful activity.'"  Bordelon, 281 F. App'x at 421 (quoting Hames, 707 F.2d

at 165); accord Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992); Hamauei v.

Astrue, No. 10-85, 2011 WL 802398, at *7 (E.D. La. Feb. 28, 2011) (quoting Hames, 707

F.2d at 165).

The ALJ's credibility and residual functional capacity findings in the instant case

are supported by the treatment notes of plaintiff's health care providers and the opinions

of consultative examiner Cristino Dijamco, M.D., who examined Charles on March 21,

2011.  Based on a review of plaintiff's treatment records and an extensive physical

examination, Dr. Dijamco diagnosed diabetes, high blood pressure and history of

osteomyelitis of the fifth digit of plaintiff's left foot.  Nonetheless, Dr. Dijamco found

that plaintiff's physical examination was "essentially unremarkable."  Charles reported

that he fed and dressed himself; performed household chores, such as sweeping,

vacuuming, mopping and cooking; and could lift a gallon of milk.  On physical

examination, he had normal findings in all of his systems, including normal motor

strength, no muscle atrophy, no neurological deficits, no ulcerations and no varicosities

in his lower extremities.  Passive range of motion of all joints was within functional limits.  Plaintiff's blood pressure was under control.  His vision was 20/40 without glasses.  Charles was able to walk on his heels and toes, squat and get on and off a chair and the examining table without significant difficulty.  He had a normal gait.  He ambulated without difficulty and without any assistive device.  (Tr. 317-19).

The ALJ discussed the "To Whom It May Concern" letter dated November 31, 2011, from Charles Patout, M.D., the medical director of the LSU Health Sciences Center Diabetic Foot Program in Baton Rouge.  Dr. Patout stated that Charles has been under that program's care since December 16, 2010, for treatment of recurrent, diabetes-related foot ulcerations at the left fifth metatarsal head, caused by loss of sensation secondary to diabetes-related neuropathy and foot deformity.  Dr. Patout opined that the ulcerations, while recurrent, "will heal" and that plaintiff's "long term prognosis is good if [Charles] avoids undue stress on his feet and always uses prescribed footwear.  He should limit his walking and avoid bending and lifting activities."  (Tr. 463).  Although plaintiff argues that the ALJ ignored Dr. Patout's opinion that Charles should limit his walking and avoid bending and lifting, the ALJ accepted the walking and lifting limitations when she found that plaintiff is capable of sedentary work, which by definition involves lifting no more than ten pounds at a time; occasionally lifting or carrying articles like docket files, ledgers and small tools; sitting for about six hours out of an eight-hour work day; and

occasionally walking or standing.  20 C.F.R. § 404.1567(a); Holifield v. Astrue, 402 F. App'x 24, 24 n.1 (5th Cir. 2010) (citing Ripley v. Chater, 67 F.3d 552, 557 n.25 (5th Cir. 1995)).  The ALJ's additional limitations of only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling at least partially incorporate Dr. Patout's opinion that Charles should avoid bending.

These medical opinions and the ALJ's credibility findings, based in large part on these opinions, are substantially consistent with the entirety of plaintiff's medical records.  His subjective complaints may be discounted when the alleged symptoms are not consistent with the objective medical evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009); Quijas v. Astrue, 298 F. App'x 391, 393 (5th Cir. 2008) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)); Hernandez v. Astrue, 278 F. App'x 333, 340 (5th Cir. 2008) (citing Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992)).

As the ALJ stated in discounting plaintiff's credibility, the record contains multiple entries regarding his noncompliance with diet, medication or physical therapy treatment, which led to many of his problems that required emergency care or hospitalization.  "Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."  Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011) (quoting Mays v.

Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)).  The ALJ's failure to list particular instances of noncompliance does not prejudice Charles in any way, especially when he admitted in his briefs to the Appeals Council and in this court that he amended his alleged onset date to June 1, 2011, to resolve any issues with noncompliance.  My review of the medical evidence confirms multiple notations of noncompliance with medication and other recommended treatment, including using appropriate footwear to relieve pressure on his feet, and that his conditions improved when he was treated and/or followed his prescribed treatment.  (Tr. 237, 249, 255, 261-63, 353, 357, 360, 399, 404, 408-12, 435, 437, 449-50).

Plaintiff contends that the record contains no documentation of any instances of noncompliance after May 2011 and that his amended onset date of June 1, 2011, removes the noncompliance issue from the ALJ's credibility determination.  However, the ALJ considered the entire record, including the period after June 1, 2011, and before her decision.  The records from plaintiff's June 25, 2011, hospital admission note his history of noncompliance with treatment, which had caused complications requiring hospitalization in the past.  These treatment records state that Charles continued to smoke marijuana, which was confirmed by a drug screening test in the hospital.  (Tr. 399-404).  Prior medical records noted that he was spending his money on marijuana instead of his medications.  Charles had been counseled repeatedly by his health care providers about

the dangers of his noncompliance with treatment, including being advised to spend his money on prescribed medication, rather than marijuana. (Tr. 408-12). The ALJ could reasonably infer from the entire record, including his continued marijuana use in June 2011, that plaintiff's noncompliance continued after May 2011 and undermined the credibility of his subjective complaints.

Contrary to his argument that he must use crutches to walk, the medical evidence shows that Charles had an unsteady gait and used crutches only for a few weeks after he was discharged from the hospital on January 21, 2011, while he was receiving daily antibiotic injections for his osteomyelitis and healing left foot ulcer. (Tr. 212, 220, 225, 456-57). Dr. Dijamco observed on March 21, 2011, that plaintiff had a normal gait and ambulated without difficulty or any assistive device.

After the ulcer healed, Charles still had a callus in the same location on the sole of his left foot. He was prescribed crutches only once on June 1, 2011 (Tr. 339), and he was noted to have been noncompliant with his foot care regimen one week earlier. (Tr. 353). The ulcer remained closed and the callus was smaller than it had been. Charles was advised to keep it covered and use prescribed shoe inserts. (Tr. 353, 437, 441-43). Despite some decreased range of motion and muscle strength in his ankles bilaterally, the diabetic foot care therapist observed on August 23, 2011, that Charles ambulated

independently with a nonantalgic gait[4] and no assistive device, and had unlimited ambulatory distance and normal standing balance. The plan of care included modifying plaintiff's footwear and instructing him to avoid use of non-prescribed footwear, indicating that he was again noncompliant with the prescribed footwear regimen. (Tr. 435). During a hospital admission from June 25 to July 4, 2011, for acute renal failure caused by severe dehydration, diabetic gastroparesis, nausea and vomiting (all of which resolved with treatment and better control of his diabetes), it was noted that Charles ambulated without difficulty and had no clubbing, cyanosis or edema in his extremities. (Tr. 399-401).

"The ALJ found the medical evidence more persuasive than the claimant's own testimony. These are precisely the kinds of determinations that the ALJ is best positioned to make." Falco, 27 F.3d at 164. "The ALJ properly considered the record as a whole, including the available medical evidence and the nature and extent of the plaintiff's daily activities, in determining that the plaintiff's subjective complaints were not fully credible." Hoelck v. Astrue, 261 F. App'x 683, 686 (5th Cir. 2008) (citing Hollis v. Bowen, 837 F.2d 1378, 1384-85 (5th Cir. 1988); Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995)).

---

[4]An antalgic gait is "a characteristic gait resulting from pain on weightbearing in which the stance phase of gait is shortened on the affected side." Id., gait, STEDMANS 156940.

The ALJ's credibility findings in this case are substantially supported by the record. She incorporated into her residual functional capacity assessment all of the functional limitations that she found credible.  Plaintiff's testimony is insufficient to establish any additional limitations.  His mere recitation of the numerous diagnoses reflected in his medical records does not establish additional functional limitations.

In the instant case, the ALJ's review of the extensive medical records was thorough and accurate.  The medical records substantially support her credibility and residual functional capacity findings.  Accordingly, this assignment of error lacks merit.

> 2. Substantial evidence supports the ALJ's finding that plaintiff's impairments do not meet or equal Listings 1.02(A), 8.04 and/or 11.14.

Charles contends that the ALJ erred by finding at the third step of the sequential evaluation that his impairment or combination of impairments does not meet either Listing 1.02(A) for disability based on major dysfunction of a major weight-bearing joint, 8.04 for chronic infections of the skin or mucous membranes, and/or 11.14 for peripheral neuropathies.[5]  The ALJ did not specifically address any of these listings in her opinion,

---

[5]Peripheral neuropathy is "a disease or degenerative state (as polyneuropathy) of the peripheral nerves in which motor, sensory, or vasomotor nerve fibers may be affected and which is marked by muscle weakness and atrophy, pain, and numbness." MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/peripheral%20neuropathy.  The peripheral nervous system is "the part of the nervous system that is outside the central nervous system and comprises the cranial nerves excepting the optic nerve, the spinal nerves, and the autonomic nervous system." Id., http://www.merriam-webster.com/medlineplus/peripheral.

but stated that she had considered section 1.00, which provides for disability based on disorders of the musculoskeletal system.   (Tr. 18).

Plaintiff argues that the ALJ's summary conclusion that he does not have an impairment or combination of impairments that meets or medically equals any listed impairment and her failure to address specifically Listings 1.02(A), 8.04 and/or 11.14 requires a remand.  The medical evidence does not substantially support a finding that Charles meets either of these listings.

Whether an impairment or combination of impairments meets a listing is a medical question that can be answered <u>only</u> by medical evidence.  20 C.F.R. §§ 404.1526(b), 416.926(b); <u>McCuller v. Barnhart</u>, 72 F. App'x 155, 158 (5th Cir. 2003); <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990); <u>McKnight v. Astrue</u>, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), <u>report & recommendation adopted</u>, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), <u>aff'd</u>, 340 F. App'x 176 (5th Cir. 2009).

"The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary." <u>Anderson v. Astrue</u>, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), <u>report & recommendation adopted</u>, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990); <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994)).  "'Whether the findings for an individual's

impairment meet the requirements of an impairment in the listings is usually more a question of medical fact than a question of medical opinion. . . .  In most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation.'"  <u>Avery v. Astrue</u>, 313 F. App'x 114, 121 (10th Cir. 2009) (quoting SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996)).

Thus, Charles must identify specific medical evidence demonstrating that he meets <u>all</u> the criteria of Listing 1.02(A), 8.04 or 11.14.  Even if the ALJ erred by failing to discuss these listings specifically, the error is harmless, unless Charles can point to substantial medical evidence that he meets one of the listings.  An ALJ's failure to explain her step three findings "does not require remand unless the claimant's 'substantial rights' were affected.  A claimant's substantial rights are affected at Step 3 when he demonstrates that he meets, or at least appears to meet, the requirements for a Listing.  In other words, the ALJ's error may be harmless."  <u>Reynolds v. Astrue</u>, No. 1:08cv228-SAA, 2010 WL 583918, at *6 (N.D. Miss. Feb. 16, 2010) (citing <u>Audler v. Astrue</u>, 501 F.3d 446, 448 (5th Cir. 2007); <u>Morris v. Bowen</u>, 864 F.2d 333, 334 (5th Cir. 2007)); <u>accord</u> <u>Tolliver v. Astrue</u>, No. 6:09-cv-0135, 2010 WL 3522396, at *6 (W.D. La. July 29, 2010), <u>report & recommendation adopted</u>, 2010 WL 3522502 (W.D. La. Aug. 31, 2010).

Listing 1.02(A) provides as follows:

> Major dysfunction of a joint(s) (due to any cause):  Characterized by gross anatomical deformity (e.g., subluxation,[6] contracture,[7] bony or fibrous ankylosis,[8] instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  <u>With</u>: A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or <u>ankle</u>), resulting in <u>inability to ambulate effectively, as defined in 1.00B2b</u> . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A) (emphasis added).

To satisfy this listing, plaintiff must show that he meets the definition of "inability to ambulate effectively" in Section 1.00(B)(2)(b).  That section provides:

> (1)  Definition.  Inability to ambulate effectively means an <u>extreme limitation of the ability to walk</u>; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation <u>without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities</u>. . . .
> (2)  To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without

---

[6]Subluxation is an "incomplete luxation or dislocation."  <u>Stedman's Medical Dictionary</u>, subluxation, STEDMANS 390690.

[7]Contracture is "[s]tatic muscle shortening due to tonic spasm or fibrosis, to loss of muscular balance, the antagonists being paralyzed or to a loss of motion of the adjacent joint."  <u>Stedman's Medical Dictionary</u>, contracture, STEDMANS 89800.

[8]Ankylosis is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint."  STEDMANS 23900.

companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the <u>inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces</u>, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

<u>Id.</u> § 1.00(B)(2)(b) (emphasis added).

Charles has failed to identify substantial evidence that he has either an anatomical deformity in his ankle or an extreme limitation of his ability to walk, as defined by Section 1.00(B)(2)(b). Although the medical records indicate that he has varus,[9] equinus[10] and hammer toe[11] deformities in his feet, the foot is not a major peripheral weight-bearing joint, as required to meet this listing. The ankle is a major peripheral weight-bearing joint, but no medical evidence demonstrates any gross anatomical deformity in either of plaintiff's ankles. In addition, as previously discussed, the medical

---

[9]Varus means "of, relating to, or being a deformity in which an anatomical part is turned inward toward the midline of the body to an abnormal degree." <u>MedlinePlus Medical Dictionary</u>, http://www.merriam-webster.com/medlineplus/varus.

[10]Talipes equinus is "a congenital deformity of the foot in which the sole is permanently flexed so that walking is done on the toes without touching the heel to the ground." <u>Id.</u>, http://www.merriam-webster.com/medlineplus/talipes+equinus.

[11]A hammer toe is "a deformed claw-shaped toe and especially the second that results from permanent angular flexion between one or both phalangeal joints." <u>Id.</u>, http://www.merriam-webster.com/medlineplus/hammer%20toe.

evidence substantially supports a finding that he can ambulate effectively and does <u>not</u> require the use of crutches or other handheld assistive devices that limit the functioning of both upper extremities.  Therefore, the ALJ did not err by finding that plaintiff does not meet Listing 1.02(A).

Listing 8.04 requires "chronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating lesions that persist for at least 3 months despite treatment as prescribed." <u>Id.</u> § 8.04.  Section 8.00 provides criteria for applying Listing 8.04, as follows:

> Extensive skin lesions are those that involve multiple body sites or critical body areas, <u>and result in a very serious limitation</u>.  Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:
> a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of <u>more than one extremity</u>; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.
> . . . .
> c. Skin lesions on the soles of <u>both feet</u> . . . that very seriously limit your ability to ambulate.

<u>Id.</u> § 8.00 (emphasis added).

The Commissioner argues, without citation to any decisions, that Listing 8.04 does not apply here because Charles's foot ulcer was caused by diabetes, not by an infection of the skin.  My own research has located no cases that address whether skin lesions that are caused by diabetes or osteomyelitis, which is an infection of the bone, could fall

under Listing 8.04.  However, one court noted recently that "Listing 9.08, the former listing for diabetes, was repealed on June 7, 2011 . . . .  <u>See</u> 74 Fed. R. 19692-01. Although diabetes itself is no longer a listed impairment, severe impairments resulting from diabetes may be of listing level severity."  <u>Whibbey v. Colvin</u>, No. CIV-12-211-D, 2013 WL 3480736, at *3 (W.D. Okla. July 10, 2013).  The Oklahoma district court therefore addressed whether plaintiff's diabetes-related skin disorders satisfied Listing 8.04.  <u>See also</u> <u>Glenn v. Comm'r</u>, No. 3:12-CV-79, 2012 WL 5378751, at *10 (S.D. Ohio Oct. 30, 2012) (leg ulcerations caused by diabetes are covered by Listing 8.04).  I do not reach this question, because I find that the medical evidence in the instant case does not substantially support <u>extensive</u> skin lesions that result in <u>serious</u> limitations.

"The point of requiring skin lesions on the soles of both feet is that such limitations could result in 'very seriously' limiting the claimant's ability to ambulate." <u>Whibbey</u>, 2013 WL 3480736, at *4.  The ulcer on the sole of plaintiff's left foot healed when he was treated for it, leaving a very small callus for which he received debridement approximately monthly.  There is no evidence of any other recurring ulcer during the relevant time period.  As previously discussed, the record does not substantially support a very serious limitation in plaintiff's ability to ambulate, nor is there substantial evidence of serious limitations in more than one extremity.  In the absence of such very

31

serious limitations, Charles has failed to identify substantial evidence that he meets Listing 8.04.

Finally, Listing 11.14 requires peripheral neuropathies "[w]ith disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14. Section 11.04(B) mandates "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." Id. § 11.04(b). Section 11.00(C) describes persistent disorganization of motor function as "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations . . . . The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." Id. § 11.00(C).

The medical evidence documents that Charles has decreased sensation in both feet. However, examining physicians, including Dr. Dijamco, have consistently found that Charles has no neurological deficits. (Tr. 234, 264, 319, 405, 413, 416). Again, the evidence does not substantially support any sustained disturbance of plaintiff's gait or

station.  Thus, substantial evidence does not support his argument that he meets or equals Listing 11.14.

For all of the foregoing reasons, this assignment of error lacks merit.

CONCLUSION

The ALJ considered all relevant medical evidence when assessing plaintiff's credibility and residual functional capacity, and her findings are supported by substantial evidence.  Plaintiff has failed to identify substantial evidence that he meets or medically equals Listings 1.02(A), 8.04 and/or 11.14.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[12]

                    New Orleans, Louisiana, this ___5th___ day of March, 2014.

                                    _____
                                        JOSEPH C. WILKINSON, JR.
                                    UNITED STATES MAGISTRATE JUDGE

---

[12]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.